SAMUEL NUGENT, Appellant, *v.* STATE OF NEW YORK, Respondent.
(Claim No. 23969.)

Third Department, March 3, 1943.

*Charles B. Sullivan,* for appellant.

*Nathaniel L. Goldstein, Attorney-General (James H. Glavin, Jr.,* and *Burns F. Barford* of counsel), for respondent.

HILL, P. J.   Plaintiff-appellant has recovered a judgment against the State for one of several items for which his claim

was filed. The State has paid the judgment and has stipulated that the acceptance thereof will not prejudice his right to seek a recovery for unallowed items. The claim arose in connection with a contract to build three and a half miles of the Eastern State Parkway. It is alleged that there was a breach of contract " by virtue of unreasonable, unnecessary and material changes along in excess of eighty-six per cent of the length of the road; " there were vigorous protests, but by reason of imperative written and parol orders given by the State acting through the chief engineer of the Taconic State Park Commission, claimant was required to act to his damage and injury. The allegation as to damages reads: " The excess cost to the undersigned claimant of completing the said contract by reason of the acts of omission and commission, malfeasance and misfeasance of the State of New York acting through the Taconic State Park Commission as aforesaid, is the sum of $110,000, and interest thereon from March 15, 1933." Claimant argues that upon the trial before the Court of Claims he established that the reasonable value of the work performed on the excavation, trenching and grading items was $239,930.91, that he received at the unit prices in the contract $171,281.11, leaving a balance his due on a *quantum meruit* basis $68,649.80. The amount now claimed is the latter figure after deducting his recovery of $8,565.71. Proof as to damages was made by an expert accountant from claimant's records and bank accounts under a theory that as to excavation, trenching and grading, the unit prices in the contract were entirely voided, and a recovery should be had on a cost plus basis.

The decision states that the award is for 1227.18 cubic yards of rock excavation at $8 per cubic yard, less $1.02, the amount bid per yard, which had been paid as a part of the final estimate. The basis for the recovery is stated in the findings: " That the State, through its agency, the Taconic State Park Commission interfered with the progress of the work by failing and omitting to provide the contractor with channel grades in due time to conform with the normal progress of the work, and by compelling the contractor to perform such requirement as a secondary operation subsequent to the usual and normal time for performing it which was contrary to good engineering practice." Claimant appeals from the judgment for inadequacy and from the portion thereof which dismisses other items of his claim, notice of which was filed September 6, 1933. The first hearing was held on May 2, 1938. The judge who heard the claim died before the decision.

The road was to be built in a new location, over rough virgin land, with variable contours, covered in part with trees and brush, with some outcroppings of ledge rock and many surface boulders. The southerly station was 279, the northerly 465. In the original contract it crossed Roaring Brook at six locations where bridges were to be built. These were not included in claimant's contract, but he was required to make certain channel changes in the brook at the proposed bridge sites. Later the State let the contract to Fox-Reynolds, Inc., to build four bridges. The location had been so changed as to eliminate two originally planned. Claimant was notified by the engineer that the roadway had been changed between stations 349-50 and 402, to an entirely new route on the westerly side of the brook, whereas previously it had been on the easterly side.

The proposal form furnished by the State contained an estimate, " earth excavation 42,000 cubic yards, rock excavation 94,000 cubic yards, embankment 146,000 cubic yards." It is admitted that the State finds no data sustaining the rock estimate. Claimant testified that as a result of bar tests it was his opinion that ledge rock did not exist on the original location at many points indicated on the State's cross sections, and would not exceed 30,000 cubic yards, with earth excavation proportionately increased above the State's estimate, and he believed that the contract was reasonably balanced between earth and rock excavation, with fills of sufficient depth to dispose of the rock, and sufficient earth for filling and covering the rock, so that borrow would not be required. In reliance thereon he bid $1.02 per cubic yard as a fair composite price for the entire excavation work, both earth and rock, together with fifteen cents per cubic yard for embankments which it was expected would be made from the earth excavated on the line of the road.

The claimant began work at the south end of the contract, working northerly, clearing the lines of the road, stripping and storing top soil and expecting to carry on the excavation and grading in a continuous manner to the northerly end. In about a month he was prepared to drill and excavate the first rock cut. He requested the engineers in charge to establish the grade for the tile underdrain so that he could drill and excavate the channel while the rock excavation within the roadway lines was being done. His request was refused. The engineers informed him that the " grades for the roadway might be changed, that final grades had not been determined and trench-

ing for underdrains could not be performed at that time." Claimant protested and informed the engineers that the cost would be greatly increased in performing the work as a secondary operation. In January, 1932, while claimant was clearing the ground northerly of station 402, he was ordered to stop for the reason that a change in the location of the roadway was going to be made, and in April following a change was made from station 393 to 465, and new plans and cross sections were furnished. (This was the second change between station 393 and 402.) Upon examination it was claimant's opinion that the second change would again increase the rock excavation and would further unbalance the entire project as between excavation, cuts, fills and embankment work.

Claimant complains that in September, 1931, the chief engineer, Bradner, required that he abandon the orderly progress of the work which he had started at the southerly end of the road and do such grading as might be found necessary to construct a work road to the places where the four bridges were to be built by the Fox Company. The work road was to be built on the line of the new highway. Claimant testifies to an oral protest: " I said, ' If we got to go and make a road, that will eat up a lot of the earth and we won't be able to do any rock work, because we will have to keep on going to get this road. * * * It will do me a lot of harm.' He [Bradner] said ' It don't make any difference, you go ahead,' I said ' If I go ahead I am going ahead under protest. Somebody has to pay me for doing this work. * * * If I go ahead and make roads for trucks, I will have to use all of the earth up and I won't have time to blast any rock.' "

The Court of Claims found against the claimant on this item. He was sustained by Fox, the bridge-builder, who gives testimony: " Q. Did you have a conversation with anyone there relative to this contract before you filed your bid? A. I did. Q. With whom? A. Mr. Bradner. Q. And in the conversation with Mr. Bradner was there any reference made by him, or by you, to the matter of your getting access to the site of these bridges, if you received the contract? * * * A. Yes, there was. Q. Give us the conversation. * * * A. As the road came up to bridge number two I asked how we were to get up to bridges one, three and four, and they told me the road would be put through by the man grading the road, where the bridges went. Q. You say they told you— A. Mr. Bradner, I am talking about. * * * Q. Was there any road built which you could use, a workable road, from the southerly end of the contract up to bridge one

at that time? A. Well, it was rough graded. He was working along blasting— * * * Q. You did use a road in addition to that, a road built by Mr. Nugent on the contract site? A. Yes, sir. Q. When did you first start to use that road? A. Well, my best recollection is that the road that we used from Peekskill Hollow ended about two hundred feet from bridge two. The next recollection is that he graded down to bridge two for us so we could get our trucks down there. Then he also graded back to number one. In the meantime all our work was done by hand, the excavating; we had no machinery. Then he moved on ahead and graded up to three and four so we could get in there also."

The engineers for the State not only raise an issue of fact as to this item, but it is argued that claimant had to make this truck road in order to get his caterpillar-borne shovel to the bridge sites to do the channel excavating. This the claimant denies, saying he would only have to remove the trees and large boulders to permit the progress of the tractor. In connection with this argument of the State the witness Fox says: " Q. And you knew Mr. Nugent had to get to the site of the proposed — the site of the bridges in order to excavate his channels? A. Yes. Q. And he did that work before you did your bridges? A. Yes. Q. And he went over a workable road built by him to do that work? A. I don't know. * * * He went over to the bridge site; I wouldn't call it a road. Q. He went over the same road that you used? A. No, sir. Q. When did he go over to the bridge site to do this work? A. Sometime before we went in there to go to work, around the end of September and the first part of October."

Claimant is entitled to payment for the additional work he did in connection with the bridge contractor's road, and to such damages as were caused him through interference with a proper plan of progress. An item of damage asserted is that the contractor, in carrying out the instructions of the engineer, used earth to grade the work road where, had he been permitted to proceed in an orderly way, rock would have been used in the depressions. The rock which could have been used increased the surplus which later was dumped into the swamp and covered with earth under the direction of the engineers.

Another claimed item is that the engineer required that the grade of the road be raised after it had been finally completed. This occurred at three places for distances varying from eleven hundred to twenty-seven hundred and fifty feet, the change varying from a few inches to two and a half feet. The court found

that the refusal to designate locations and grades in connection with rock cuts was arbitrary and unreasonable. Changes of grades after a road was finished seem to be in the same category. Slopes of embankments adjacent to cuts were changed in a manner asserted to have been costly, as a steamshovel had to be driven up a ramp in order to do the work from the top. The proof is not clear whether the proportion of rock excavation on the new courses was greater than on the location as originally planned. If so, it was a substantial change, as the bid was made assuming that $1.02 a cubic yard was a fair composite price. The excavation of rock is more expensive. There are other minor items.

It is argued on behalf of the State that the claimant did not sufficiently protest the numerous changes. This is gainsaid by the evidence of the claimant and by an entry in the diary of the engineer Richardson in charge of the field work:

"Mr. Nugent made a visit to the field office very much upset and made the following statements, that the work could be finished on time at an expense of $30,000.00; that the work was now 80 per cent complete; that the engineers in charge were trying to make him go broke to get him off the job; that he would complete the job in spite of them; that he would have a licensed engineer on the job Monday, May 16th, 1932, who would make a check on the complete job. That the contractor would then go to Court and that somebody would go to jail — the person going to jail was not definitely named. Other statements were made about undesirable traits of the engineers in charge. None of these statements were complimentary and need not be remembered."

The following testimony appears: "Q. As a matter of fact, Mr. Richardson, considerable feeling had developed on this contract between the contractor and the engineers prior to this date? A. Mr. Nugent was very much aroused." Richardson further says that he made records for the purpose of criticizing the contractor in court. There is an unexplained and very substantial change in the engineer's estimate as to the rock removed from the new location. The aggregate of the original entries was reduced for some unexplained reason by many thousands of cubic yards. Upon the final payment it was agreed between the representatives of the State and the claimant that he expressly reserved the right to make and prosecute a claim against the State.

The contractor is entitled to recover the value of extra work and material upon *quantum meruit* as a measure of damages for breach of contract. (*Gearty* v. *Mayor, etc., of New York,*

171 N. Y. 61; *Lentilhon* v. *City of New York*, 102 App. Div. 548, affd. 185 N. Y. 549; *Borough Const. Co.* v. *City of New York*, 200 N. Y. 149; *Collins* v. *State of New York*, 259 N. Y. 200.) Most if not all of the items complained of are identifiable with the contract to build the road, even though it was moved from side to side and raised and lowered with disregard to the original plans and apparently to claimant's damage. None of the items seem " so preposterous that there could be no reasonable doubt that it exceeded the obligations of the contract * * *." (*Borough Const. Co.* case, *supra*, p. 158.) The recovery must be for extra work on *quantum meruit*, not upon claimant's theory on the trial to disregard unit prices named in the contract. His theory seems to have been that he could recover on a sort of cost plus arrangement. The portion of the judgment appealed from should be reversed on the law and facts and a new trial granted, and findings as indicated in the formal decision should be reversed and new findings made.

CRAPSER, HEFFERNAN and SCHENCK, JJ., concur; BLISS, J., taking no part.

Judgment so far as appealed from reversed on the law and facts, and a new trial ordered in the Court of Claims on the issues not hereinafter determined, with costs to the appellant to abide the event.

The court reverses the following findings of fact contained in the decision: Numbers 15, 19, 21, 22, 23, 25 and 26, and disapproves of conclusions of law numbers 2, 3, 4 and 6, and modifies finding 18 in the decision by substituting for the word " therefore " (sic) " on account thereof; " also findings of fact adopted by reference thereto in finding number 29 of the decision in paragraphs of the State's requests to find numbered 12, 13, 15, 16, 17, 18, 19, 20, 28, 29, 30, 31, 32, 35, 36, 37, 38, 39, 40, 42, 43, 44, 45, 46, 48, 49, 50, 52, 53, 54, 58, 60, 61, 62, 64, 65, 66, 67, 68, 69, 71, 72, 73, 74, 75, 76, 77, 78, 79, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 96, 97, 98, 99, 100, 109, 110 and 111.

The court makes new findings of fact as set forth in claimant's requests to find numbered 6, 19, 21, 22, 23, 26, 27, 29, 30, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 46, 47, 48, 52, 58, 59, 66, 67, 68, 70, 71, 72 and 74.